IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 21-cv-00964-CMA-NYW

TAMMY L. BAUM

    Plaintiff,

v.

DUNMIRE PROPERTY MANAGEMENT, INC.,

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This matter is before the Court on Defendant Dunmire Property Management, Inc.'s Motion to Dismiss Plaintiff's Complaint. (Doc. # 17.) For the following reasons, the Motion is granted.

### I.    BACKGROUND[1]

This is an employment action involving allegations of wrongful termination. Plaintiff Tammy L. Baum was employed by Dunmire Property Management, Inc. ("Dunmire") from December 2019, through March 28, 2020. (Doc. # 1 at ¶ 6.) Dunmire is a property management company that manages multi-family properties. (*Id.* at ¶ 7.) It employs more than fifteen employees. (*Id.*)

---

[1] The Court draws the following facts from the Complaint and presumes they are true for purposes of the Motion to Dismiss. *See Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

Plaintiff was employed by Dunmire as an accounts receivable clerk. (*Id.* at ¶ 9.) Her primary duties included entering data and deposits and maintaining residents' files. (*Id.* at ¶ 10.) Plaintiff alleges that she "performed her duties competently" and "Dunmire never disciplined Plaintiff for her performance either orally or in writing." (*Id.* at ¶ 11.)

On March 16, 2020, Plaintiff sent a text message to her direct supervisor, Lulu Elliot, Dunmire's Controller. (*Id.* at ¶ 12.) The text message informed "Ms. Elliot that Plaintiff's father, James Kinkaid, had been admitted to the hospital for respiratory issues and was being tested for COVID-19." (*Id.*)

According to Plaintiff, Ms. Elliot responded the same day and asked Plaintiff questions about Mr. Kinkaid's illness, including asking when he "first became symptomatic, when Plaintiff last had contact with her father, and whether her father had been given a COVID-19 test." (*Id.* at ¶ 13.) Plaintiff alleges that she responded, stating that she had contact with her father many times over the previous several weeks, but she did not have any COVID-19 symptoms. (*Id.* at ¶ 14.)

In response, Ms. Elliot allegedly instructed Plaintiff not to return to the office until Plaintiff "found out the results of her father's COVID-19 test." (*Id.* at ¶ 15.) Plaintiff avers that Ms. Elliot informed her that she would be putting "Dunmire and its residents at risk if her father tested positive." (*Id.*) Plaintiff also alleges that Ms. Elliot denied Plaintiff's request to work from home. (*Id.*)

Ms. Elliot allegedly followed up the next day on March 17, 2020, inquiring as to the status of Mr. Kinkaid's test results. (*Id.* at ¶ 16.) Plaintiff alleges that she sent a

message to Ms. Elliot that day and the next day, informing her that she did not have test results yet. (*Id.* at ¶¶ 16–17.)

Plaintiff alleges that on March 18, 2020, she sent an email to Dunmire's Vice President, Amy Rizzuto, informing Ms. Rizzuto of the text messages with Ms. Elliott and expressing concern about losing her job due to her father's illness. (*Id.* at ¶ 18.) Ms. Rizzuto allegedly responded via email on March 19, 2020, "stating that all Dunmire employees who ha[d] been in contact with someone ill" should self-quarantine. (*Id.* at ¶ 19.)

Plaintiff alleges that she spoke with Ms. Elliot that same day, via text message and by telephone. (*Id.* at ¶¶ 20–21.) According to Plaintiff, Ms. Elliot denied her request to work remotely, and Plaintiff was the only Dunmire employee who was not permitted to work remotely. (*Id.* at ¶¶ 20–22.)

On March 20, 2020, another Dunmire employee asked Plaintiff via text message whether Plaintiff's father had tested positive for COVID-19. (*Id.* at ¶ 23.) Plaintiff responded on March 26, 2020, informing that employee that her father had tested positive for COVID-19. (*Id.* ¶ 24.)

On March 27, 2020, Plaintiff again requested to work from home. (*Id.* at ¶ 25.) In response, a Dunmire employee asked how Plaintiff was feeling and if she had "[a]ny problems." (*Id.* at ¶ 25.) The next day, on March 28, 2020, Ms. Elliot informed Plaintiff via telephone that Dunmire was rearranging the office and that Plaintiff's position was eliminated. (*Id.* at ¶ 26.) Ms. Elliot sent a text message the following day stating that

Plaintiff was being laid off. (*Id.* at ¶ 27.) Plaintiff's father died on March 31, 2020, due in part to COVID-19. (*Id.* ¶ 28.)

Plaintiff's Complaint sets forth three causes of action: (1) Violation of the Americans with Disabilities Act, under 42 U.S.C. § 12101; (2) Violation of the Genetic Information Nondiscrimination Act; and (3) Wrongful Termination in Violation of Public Policy. (*Id.* at 6–9.)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1198. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The

*Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

### III.   DISCUSSION

Defendant argues that Plaintiff has failed to state a claim for relief because she "cannot establish that COVID-19 is a disability as defined under" the Americans with Disabilities Act ("ADA"). (Doc. # 17 at 2.) Defendant also argues that it did not violate the Genetic Information Nondiscrimination Act because "Plaintiff voluntarily disclosed to Dunmire that her father had COVID-19 symptoms, and Dunmire's actions followed CDC guidelines for employers." (*Id.* at 2.) Finally, Defendant argues that Plaintiff's public

5

policy claim must be dismissed because the law upon which she relies to state her claim was not in effect at the time of her termination. (*Id.* at 2.) The Court addresses each argument in turn.

**A.      FIRST CAUSE OF ACTION: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

The ADA makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* at § 12112(b)(4). This prohibition is known as the "association provision" of the ADA. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1154 (10th Cir. 2008) (citing *Den Hartog v. Wasatch Acad.,* 129 F.3d 1076, 1082 (10th Cir. 1997)). "A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA." *Den Hartog,* 129 F.3d at 1082 (citing 29 C.F.R. § 1630.8). Thus, Plaintiff's relationship with her father is protected by the association provision.

At the motion to dismiss phase, a plaintiff is not required to establish a prima facie case to prove her claim under the ADA. *See Steele v. Stallion Rockies Ltd*, 106 F. Supp. 3d 1205, 1209 (D. Colo. 2015); *see also Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050 (10th Cir. 2020). Rather, the Court must consider whether the plaintiff has set forth a plausible claim in light of the elements of her claim. A plaintiff proves a violation of the ADA by direct evidence of discrimination or by following the

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

Under the *McDonnell Douglas* test, a plaintiff must establish a prima facie case of discrimination. *Id.* To establish a prima facie case of ADA association discrimination, a plaintiff must prove that: (1) she was "qualified" for the job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Den Hartog,* 129 F.3d at 1085.

Once a plaintiff meets this burden, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for terminating the employee's employment. *Id.* If the employer does so, the burden shifts back to the plaintiff to provide evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, at the motion to dismiss stage, the plaintiff need not rebut a defendant's proffered rationale for termination. *See Adenowo v. Denver Pub. Sch.*, No. 14-cv-02723-RM-MEH, 2015 WL 4511924, at *3 (D. Colo. June 17, 2015), *report and recommendation adopted,* No. 14-cv-02723-RM-MEH, 2015 WL 4504931 (D. Colo. July 24, 2015) (observing that at the motion to dismiss stage "a plaintiff is not required to meet the burden-shifting framework, where the initial burden is on a plaintiff to establish a prima facie case of discrimination").

7

Plaintiff alleges that she performed her duties "competently" and was "qualified for and did satisfactorily perform the essential functions of her job as an accounts receivable clerk." (Doc. # 1 at ¶¶ 11, 32.) Plaintiff also alleges that she was terminated from her job. (*Id.* at ¶¶ 33–34.) Thus, there is no dispute that Plaintiff suffered an adverse employment action. Accordingly, Plaintiff has sufficiently alleged two prongs necessary to establish a prima facie case for association discrimination under the ADA.

The parties primarily dispute whether Plaintiff has plausibly alleged the third and fourth factors necessarily to establish a prima facie case: (1) that her father had a disability as defined by the ADA; and (2) that the termination occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

The ADA defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADA directs courts to construe "disability" in "favor of broad coverage of individuals" to the "maximum extent permitted by the terms" of the statute. *Id.* § 12102(4). Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one. *See Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1250 (D. Colo. 2012), *aff'd,* 550 F. App'x 596 (10th Cir. 2013) (noting that Congress intended to provide "a broad construction of the definition of disability").

Federal courts around the country are grappling with whether COVID-19 constitutes a disability under the ADA. *Compare Champion v. Mannington Mills, Inc.*,

538 F. Supp. 3d 1344, 1349 (M.D. Ga. 2021) (explaining that to find millions of Americans "disabled" under the ADA would lead to absurd results) *with Matias v. Terrapin House, Inc.*, 21-cv-02288, 2021 WL 4206759, at *4 (E.D. Pa. Sept. 16, 2021) (citing agency guidance to conclude that COVID-19 may be an ADA disability as it is not always transitory and is not minor); *see also Booth v. GTE Fed. Credit Union*, 21-cv-1509-KKM-JSS, 2021 WL 5416690, at *6 (M.D. Fla. Nov. 20, 2021) (analyzing the lack of consensus regarding whether COVID-19 is a disability under the ADA).

Recent regulatory guidance suggests that, in some circumstances, COVID-19 may be considered a disability under the ADA. *See Matias*, 2021 WL 4206759, at *4. For example, the Department of Health and Human Services and Department of Justice jointly developed the *Guidance on "Long COVID" as a Disability Under the ADA, Section 504 and Section 1557*, DEP'T OF HEALTH & HUM. SERVS. & DEP'T OF JUSTICE (July 26, 2021), https://www.ada.gov/long_covid_joint_guidance.pdf ("ADA Guidance"). The ADA Guidance notes that COVID-19 may be a "physical or mental impairment under the ADA." *Id.* at 3. The guidance further notes that certain forms of COVID-19 can "substantially limit major life activity" as required to be considered a disability under the ADA. *Id.* at 4. Examples include, but are not limited to, limited "respiratory function, among other major life activities." *Id.*

The Equal Employment Opportunity Commission ("EEOC") also recently released guidance about when COVID-19 can constitute a disability under the ADA. *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. EQUAL EMP. OPPORTUNITY COMM'N (Dec. 14, 2021),

9

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("EEOC Guidance"). The EEOC Guidance notes that COVID-19 may be a disability, but it is not always a disability. *Id.* at N.3. Whether COVID-19 is an actual disability under the ADA requires a "case-by-case determination." *Id.* at N.2. Further, according to the EEOC, an individual who is asymptomatic or who has mild symptoms will not have a disability within the meaning of the ADA. *Id.* However "a person with COVID-19 has an actual disability if the person's medical condition . . . substantially limits one or more major life activities." *Id.* (alterations omitted).

While not binding on the Court, "this guidance is helpful in deciding the issue of whether COVID-19 can be a disability; and it guides that COVID-19 can be a disability, so long as the condition is sufficiently severe to impair major life activities." *Brown v. Roanoke Rehab. & Healthcare Ctr.*, 21-cv-00590-RAH, 2022 WL 532936, at *3 (M.D. Ala. Feb. 22, 2022) (analyzing an ADA COVID-19 disability claim based on regulatory guidance). However, the common theme in this regulatory guidance is that COVID-19 may be a disability when it is long-term—lasting for months—not when it is acute. *See* ADA Guidance, at 1; EEOC Guidance, at N.4. The ADA Guidance refers to individuals with "Long COVID," who experience symptoms "months after first being infected, or may have new or recurring symptoms at a later time." ADA Guidance, at 1. The EEOC Guidance also refers to individuals who experience symptoms lasting for months. EEOC Guidance, at N.4.

In this case, Plaintiff has failed to plausibly allege that her father's COVID-19 diagnosis and related respiratory issues constitute a disability under the ADA. Plaintiff alleges that her father was "admitted to the hospital for respiratory issues." (Doc. # 1 at ¶ 12.) Plaintiff's father had "a history of respiratory illness," and he ultimately tested positive for COVID-19. (*Id.* at ¶¶ 18, 24.) Plaintiff's father died on March 31, 2020, as a result of "acute respiratory distress syndrome, bilateral pneumonia, and COVID-19." (*Id.* at ¶ 28.) Plaintiff's father died within 15 days of the onset of his illness. (*Id.* at ¶¶ 12, 28.)

Plaintiff's allegations are insufficient to state a claim under the ADA. As an initial matter, the ADA contemplates long-term disabilities that impair major life activities. Illness that are transitory in nature are not disabilities within the meaning of the ADA. *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016) (noting that a plaintiff alleging disability must show that "impairment is neither transitory or minor). Although Plaintiff's father died, his illness lasted for only 15 days. Such an acute, short-term illness is too transitory in nature to constitute a disability under the ADA.

Further, Plaintiff's father's illness was not the type of Long COVID contemplated by the ADA or EEOC guidance. If acute, short-term COVID-19 is considered a disability, then millions of Americans would suddenly qualify as disabled under the ADA. *See Champion*, 538 F. Supp. 3d at 1349 (noting that "employers across the nation will be shocked to learn that if any of their employees are sick for just a few days, then those employees are 'disabled' and now protected by the ADA"). Moreover, flus and common colds are not regarded as a disability within the meaning of the ADA. *Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 537 (E.D. Pa. 2016), *aff'd sub*

*nom. Kieffer v. CPR Restoration & Cleaning Servs., LLC*, 733 F. App'x 632 (3d Cir. 2018) (collecting cases about the common cold or flu under the ADA and noting that "[t]he common cold is precisely the kind of 'transitory and minor' impairment that is not considered a disability under the ADA").

Finally, to state a claim for association discrimination under the ADA, Plaintiff must allege that the discrimination was based on one's association with a person who has a "*known* disability." 42 U.S.C. § 12112(b)(4). In this case, Plaintiff has failed to allege that Dunmire knew that her father had a disability. Plaintiff alleges that Defendant knew Plaintiff's father was suffering from cold-like respiratory symptoms, but there are no allegations that Dunmire had knowledge of Plaintiff's father's disability of acute respiratory disease. Although Plaintiff alleges that her father died from "acute respiratory disease" (Doc. # 1 ¶ 28), there are no allegations that Dunmire knew of her father's disease when it terminated her. Accordingly, Plaintiff has failed to allege that her father had a disability within the meaning of the ADA. Accordingly, Plaintiff has failed to state a plausible claim for relief for violation of the Americans with Disabilities Act.[2]

### B.  SECOND CAUSE OF ACTION: VIOLATION OF THE GENETIC INFORMATION NONDISCRIMINATION ACT

The Genetic Information Nondiscrimination Act ("GINA") makes it illegal for employers to terminate or otherwise discriminate against an employee because of the

---

[2] The Court has already determined that Plaintiff failed to plausibly allege the third prong necessary to state a claim for discrimination under the ADA. Accordingly, the Court need not analyze the final prong, whether Plaintiff has plausibly alleged that the termination occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

employee's genetic information. 42 U.S.C.A. § 2000ff-1(a)(1). Genetic information includes any information about "the manifestation of a disease or disorder in family members of such individual." 42 § 2000ff(4)(A). GINA also generally prohibits employers from requesting genetic information from employees. 42 U.S.C. §§ 2000ff-1(b), 2000ff-6(f). "The manifestation of a disease or disorder in family members" refers to family medical history.

Since its passage in 2008, courts in the Tenth Circuit have had one occasion to analyze a GINA claim. *See Punt v. Kelly Servs.*, No. 14-CV-02560-CMA-MJW, 2016 WL 67654, at *1 (D. Colo. Jan. 6, 2016), *aff'd,* 862 F.3d 1040 (10th Cir. 2017). In *Punt*, the Court recognized that "the sparse case law that does exist is unsettled as to whether plaintiff can sustain a GINA claim at summary judgment by proffering sufficient evidence to show that the employer took an adverse action **because of** the employee's qualifying genetic information, or whether such a showing also triggers a burden-shifting scheme akin to the *McDonnell-Douglas* framework." *Id.* at *13 (collecting cases at n.13; emphasis in original). The Court ultimately determined that the burden-shifting framework should apply to a GINA claim. *Id.* Applying that framework, the Court dismissed the plaintiff's GINA claim. *Id.*

On appeal, the Tenth Circuit affirmed the Court's order, finding that the plaintiff: (1) had not presented evidence that would permit a jury to infer that the defendants had knowledge of her genetic history; and (2) even if the plaintiff had such evidence, she presented no "evidence or argument to suggest that [the defendants'] legitimate nondiscriminatory reason for her termination was a pretext for discrimination on the

13

basis of genetic information." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1052 (10th Cir. 2017).

At the motion to dismiss phase, Plaintiff is not required to establish a prima facie case to prove her GINA claim. *See, e.g.*, *Steele*, 106 F. Supp. 3d at 1209. However, Plaintiff must set forth a plausible claim for relief. Further, she must allege that her father's alleged illness is of the type of genetic information implicated by GINA, including one of the following: (1) an "individual's genetic tests;" (2) "the genetic tests of family members of such individual;" and (3) "the manifestation of a disease or disorder in family members." 42 U.S.C. § 2000ff(4)(A).

Plaintiff has not plausibly alleged that her father's alleged illness was "the manifestation of a disease or disorder in family members" as required by GINA. For discrimination based on family medical history to violate GINA, the family medical condition must have a genetic predisposition and the employer must have believed that the medical information at issue had a genetic basis. *See Tedesco v. Pearson Educ., Inc.*, 21-cv-199, 2021 WL 2291148, at *6 (E.D. La. June 4, 2021). In other words, "the plaintiff must allege at least that the employer, when requesting family medical history, believed it was dealing with genetic information. Holding otherwise could impose liability on employers merely for inquiring about the health or safety of an employee's family member, a scenario to which the relevant regulations expressly counsel against applying GINA." *Id.*; see also *Dabrowski v. Mayorkas*, 19-cv-3679, 2022 WL 715216, at *6 n.12 (D.D.C. Mar. 10, 2022) (collecting cases).

In this case, Plaintiff alleged that her father had respiratory symptoms consistent with COVID-19. She also disclosed that her father had COVID-19. This is not the kind of genetic information contemplated by GINA. Indeed, contracting COVID-19 is not a disease caused by a "genetic disposition." Therefore, Plaintiff has failed to state a claim for relief under the Genetic Information Nondiscrimination Act.[3]

## C.     THIRD CAUSE OF ACTION: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

Finally, Dunmire moved to dismiss Plaintiff's third cause of action for wrongful termination in violation of public policy. Plaintiff's third cause of action is based on an allegation that Dunmire violated "Colorado public policy, and specifically Colorado Executive Order D 2020 0044," which "mandates that employers accommodate workers affected by COVID-19 by promoting telecommuting or other remote work options." (Doc. # 1 at ¶¶ 42–47.)

As noted by Defendant, however, the public policy upon which Plaintiff relies was implemented after Plaintiff was terminated. Executive Order D 2020 044 was implemented on April 26, 2020. *See 2020 Executive Orders*, COLORADO GOVERNOR JARED POLIS (April 26, 2020), https://www.colorado.gov/governor/2020-executive-orders. Executive Order D 2020 044 was amended and extended on May 25, 2020. (*Id.*) Plaintiff was terminated in March 2020. (Doc. # 1 at ¶ 33.) Accordingly, Plaintiff has

---

[3] The Court also notes that the EEOC Guidance permits employers to ask employees about COVID-19 diagnoses in family members, including whether the employee has had contact with family members who have been diagnosed with COVID-19. *See* EEOC Guidance, at A.10. While not binding on the Court, this guidance further supports the Court's finding that COVID-19 is not "family medical history" within the meaning of GINA.

failed to state a claim for relief for her third cause of action for wrongful termination in violation of public policy.

Moreover, Plaintiff did not respond to Defendant's argument that count three must be dismissed. As noted by Defendant, "[w]hen an argument upon a motion to dismiss that claim is subject to dismissal, and the non-moving party fails to respond to such an argument, such claims are deemed abandoned and subject to dismissal." *Schone v. Sodexo, Inc.*, 19-cv-02283-SKC, 2021 WL 915937, at *3 (D. Colo. Mar. 10, 2021) (citations omitted). Thus, because Plaintiff failed to respond to Defendant, the Court deems this claim as having been abandoned based on her failure to raise any arguments to save the claim from dismissal.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court ORDERS as follows:

- Defendant's Motion to Dismiss (Doc. # 17) is GRANTED.
- The Court DISMISSES, with prejudice, Plaintiff's Complaint (Doc. # 1).
- The Clerk of the Court is directed to close this case.

DATED:  March 25, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge